IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
LYNCHBURG DIVISION

| | | |
|---|---|---|
| CAROL A. VITRANO, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 6:14-cv-51 |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION**

Plaintiff Carol A. Vitrano ("Vitrano") challenges the decision of the Commissioner of Social Security ("Commissioner") finding her not disabled and therefore ineligible for disability insurance benefits ("DIB") under the Social Security Act ("Act"). 42 U.S.C. §§ 401–433. Vitrano alleges that the ALJ erred for several reasons that are each addressed below. Having reviewed the record and heard oral argument, I conclude that the Commissioner's decision is supported by substantial evidence. Accordingly, I hereby **GRANT** the Commissioner's Motion for Summary Judgment (Dkt. No. 15) and **DENY** the Plaintiff's Motion for Summary Judgment (Dkt. No. 13).

**STANDARD OF REVIEW**

This court limits its review to a determination of whether substantial evidence supports the Commissioner's conclusion that Vitrano failed to demonstrate that she was disabled under the Act.[1] Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001). "Substantial evidence is such

---

[1] The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment, which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Disability under the Act requires showing more than the fact that the claimant suffers from an impairment which affects his

1

relevant evidence as a reasonable mind might accept as adequate to support a conclusion; it consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996) (internal citations and alterations omitted). The final decision of the Commissioner will be affirmed where substantial evidence supports the decision. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).

## **CLAIM HISTORY**

Vitrano filed for DIB on February 2, 2011, claiming that her disability began on September 24, 2010, due to fibromyalgia, osteoporosis, severe arthritis, depression, neck and lower back pain, occipital nerve pain and constipation. R. 268, 284. The state agency denied Vitrano's application at the initial and reconsideration levels of administrative review. R. 157–179. On March 20, 2013, ALJ Mark O'Hara held a hearing to consider Vitrano's disability claim. R. 104–56. Vitrano was represented by an attorney at the hearing, which included testimony from Vitrano, her friend Bonnie Kenyon and vocational expert Harry Hensley. Id.

On August 20, 2013, the ALJ entered his decision analyzing Vitrano's claim under the familiar five-step process[2] and denying her claim for benefits. R. 78–97. The ALJ found that Vitrano was insured through March 31, 2016, and that she engaged in substantial gainful activity until January 1, 2011. R. 80. The ALJ also noted that Vitrano reported work activity during

---

ability to perform daily activities or certain forms of work. Rather, a claimant must show that his impairments prevent him from engaging in all forms of substantial gainful employment given his age, education, and work experience. See 42 U.S.C. §§ 423(d)(2), 1382c(a)(3)(B).

[2] The five-step process to evaluate a disability claim requires the Commissioner to ask, in sequence, whether the claimant: (1) is working; (2) has a severe impairment; (3) has an impairment that meets or equals the requirements of a listed impairment; (4) can return to his past relevant work; and if not, (5) whether he can perform other work. Johnson v. Barnhart, 434 F.3d 650, 654 n.1 (4th Cir. 2005) (per curiam) (citing 20 C.F.R. § 404.1520); Heckler v. Campbell, 461 U.S. 458, 460–62 (1983). The inquiry ceases if the Commissioner finds the claimant disabled at any step of the process. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The claimant bears the burden of proof at steps one through four to establish a prima facie case for disability. The burden shifts to the Commissioner at the fifth step to establish that the claimant maintains the residual functional capacity ("RFC"), considering the claimant's age, education, work experience, and impairments, to perform available alternative work in the local and national economies. 42 U.S.C. § 423(d)(2)(A); Taylor v. Weinberger, 512 F.2d 664, 666 (4th Cir. 1975).

2011 and thereafter. R. 80–81. The ALJ determined that Vitrano suffered from the severe impairments of "questionable fibromyalgia syndrome, spine disorder and borderline obesity at times." R. 81. The ALJ determined that these impairments, either individually or in combination, did not meet or medically equal a listed impairment. R. 83–84. The ALJ concluded that Vitrano retained the residual functional capacity ("RFC") to perform modified light work that involves occasional pushing and pulling with the right upper extremity, no climbing of ladders, ropes, or scaffolds, and occasional postural activities such as climbing stairs, ramps, balancing, stooping, kneeling, crouching and crawling. R. 84. The ALJ determined that Vitrano could return to her past relevant work as a customer service representative and was not disabled. R. 96–97.

Vitrano appealed the ALJ's decision, and submitted additional medical records to the Appeals Council. R. 10–55, 65–72. On November 18, 2014, the Appeals Council denied Vitrano's request for review (R. 1–5) and this appeal followed.

## ANALYSIS

### Severe Impairments

Vitrano argues that the ALJ erroneously concluded that her depression, anxiety, carpal tunnel syndrome and occipital nerve pain were not severe impairments. The ALJ determined that Vitrano suffered from severe impairments of fibromyalgia syndrome, spine disorder and borderline obesity and stated, "[t]he undersigned finds all other impairments found in the record to be nonsevere because they did not exist for a continuous period of 12 months, were responsive to medication, did not require significant medical treatment, or did not result in any continuous exertional or non-exertional functional limitations." R. 81.

An impairment is non-severe when it causes no significant limitations in the claimant's ability to work. 20 C.F.R. §§ 404.1521(a), 416.921(a). "[A]n impairment can be considered as

3

'not severe' only if it is a slight abnormality which has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience." Evans v. Heckler, 734 F.2d 1012, 1014 (4th Cir. 1984) (citing Brady v. Heckler, 724 F.2d 914, 920 (11th Cir. 1984). Additionally, an impairment must last, or be expected to last for a continuous period of at least 12 months to be considered "severe." 20 C.F.R. §§ 404.1509, 404.1520(a)(4)(ii). Vitrano bears the burden of proving that her depression, anxiety, carpal tunnel syndrome and occipital nerve pain are severe. Pass v. Chater, 65 F.3d 1200, 1203 (4th Cir. 1995).

Further, under 20 C.F.R. § 404.1523, the ALJ must consider the combined effect of all of a claimant's impairments "without regard to whether any such impairment, if considered separately, would be of sufficient severity." 20 C.F.R. § 404.1523. "Thus, the issue of whether or not a particular impairment is found severe is only critical if the ALJ finds no severe impairment and ends the analysis at step two; if any impairment is severe, the ALJ must consider all impairments when assessing residual functional capacity." Miller v. Astrue, No. 8:10-1142-HMH-JDA, 2011 WL 1576203, at *15 (D.S.C. Apr. 7, 2011). Consequently, any error by the ALJ at step two is harmless if the ALJ considers the effects of all of Vitrano's impairments in the subsequent steps. See Brooks v. Astrue, No. 5:10CV00104, 2012 WL 1022309, at *12 (W.D. Va. Mar. 26, 2012) (citing Miller, 2011 WL 1576203, at *15); see also Gaskins v. Comm'r, No. WDQ–13–1470, 2014 WL 979205, at *5 (D. Md. March 12, 2014); Hammond v. Astrue, No. TMD 11–2922, 2013 WL 822749, at *2 (D. Md. March 5, 2013) (collecting cases).

Here, substantial evidence supports the ALJ's conclusion that Vitrano's carpal tunnel syndrome, occipital nerve pain, migraines, depression and anxiety were non-severe impairments. The ALJ considered each of those impairments in depth in step four of his analysis and

accounted for them when determining Vitrano's RFC. Thus, even if the ALJ erred by labeling those impairments as non-severe, the error is harmless.

With regard to Vitrano's carpal tunnel syndrome, the ALJ recognized that Vitrano sought and received treatment for carpal tunnel syndrome, including steroid injections, but correctly noted that the record does not reflect any nerve conduction studies or electromyographic tests to confirm the presence of carpal tunnel syndrome. Despite labeling Vitrano's carpal tunnel syndrome as "non-severe," the ALJ considered the effects of this impairment during his RFC analysis. The ALJ considered the records documenting Vitrano's complaints of and treatment for carpal tunnel syndrome in detail at step four of his analysis. R. 84–96. The ALJ considered the opinions of Vitrano's physician assistant and the state agency physicians regarding her functional limitations, and adopted the opinions of the state agency physicians that Vitrano was limited to frequent handling and fingering due to her carpal tunnel syndrome. R. 175. The ALJ also asked the vocational expert if a limitation of frequent fingering and handling would prevent Vitrano from performing her past relevant work as a customer service representative. R. 150. The ALJ concluded that the evidence reflected that Vitrano's carpal tunnel syndrome had no more than a minimal impact on her functional capabilities. R. 81–82.

Accordingly, the record reflects that the ALJ properly analyzed and accounted for Vitrano's carpal tunnel syndrome despite labeling it a "non-severe" impairment. Thus, any error by the ALJ in determining that Vitrano's carpal tunnel was non-severe at step two is harmless because he considered the effects of Vitrano's carpal tunnel syndrome in formulating the RFC.

Vitrano also argues that the ALJ erred by failing to consider her occipital nerve pain and migraines to be severe impairments. Pl's Br. Summ. J. p. 13–14. The ALJ did not specifically

5

discuss Vitrano's occipital nerve pain and migraines in his step two analysis. However, the ALJ determined that Vitrano's fibromyalgia, spine disorder and obesity were severe impairments and discussed her occipital nerve pain and migraines at length in evaluating her RFC. See R. 85 ("[s]he endorsed chronic headaches"); R. 87 ("[s]he complained of very frequent headaches"); R. 88 ("occipital nerve tenderness on the right and left side," "diagnosed…occipital neuralgia"); R. 90 ("claimant underwent a left occipital nerve block"); R. 92 ("claimant complained of a week history of migraine headaches with associated nausea, recently gone for 10 days without any pain medications"). The ALJ fully considered the medical evidence regarding Vitrano's occipital nerve pain and migraines, and accounted for these complaints when limiting her to a range of light work. Thus, any error by failing to label Vitrano's occipital nerve pain and migraines "severe" impairments is harmless.

Vitrano also asserts that the ALJ erred by failing to discuss whether her mental limitations met the "paragraph A" criteria of Listing 12.04 or 12.06. Pl. Br. Summ. J. p. 7. Vitrano asserts that the ALJ's failure to discuss the "paragraph A criteria" of those listings caused him to incorrectly analyze the extent of her anxiety and depression and improperly assess her credibility. Id. Vitrano also contends that the ALJ ignored the treatment she received for anxiety and depression through her family practice and medication. Pl. Br. Summ. J. p. 8. Vitrano emphasizes her long history of complaints and treatment for mental issues and asserts that she suffered from moderate limitations with daily activities, social functioning, concentration, persistence and pace.[3]

---

[3] Vitrano relies in part upon a treatment record provided to the Appeals Council after the ALJ's decision in this case, reflecting that she was admitted to the hospital for major depression and suicidal ideation on October 10, 2014. R. 11–12. This occurred over a year after the ALJ's decision, and there is no indication that it relates back to the relevant time period in this case. Indeed, the record reflects that Vitrano's medications were changed shortly before the incident, and after her medications were adjusted she had an excellent response and was discharged with instructions to follow up with counseling and medication management. Id.

6

The ALJ must use a special technique to determine the severity of mental impairments. 20 C.F.R. § 404.1520a. The ALJ must first evaluate the claimant's pertinent symptoms, signs and laboratory findings to determine whether she has a medically determinable mental impairment. If the ALJ determines that a medically determinable mental impairment exists, the ALJ must then rate the degree of functional limitation resulting from the impairments in four broad functional areas: 1) daily living, 2) social functioning, 3) concentration, persistence, or pace, and 4) decompensation. Id. Mental impairments will be considered severe if they cause more than mild limitations in one of the four broad functional areas. Id.

Here, the ALJ followed the guidelines of the regulations. The ALJ considered Vitrano's allegations of severe mental health symptoms, her medical records and the opinions of the reviewing and examining physicians. The ALJ determined that Vitrano suffered from the medically determinable mental impairments of depression and anxiety. R. 82. When analyzing the severity of those impairments, the ALJ properly considered the four functional areas of daily living, social functioning, concentration, persistence or pace, and episodes of decompensation. R. 82. He found that Vitrano had mild limitations in her activities of daily living and no limitations in social functioning or concentration, persistence and pace, and no episodes of decompensation. Id. Thus, the ALJ determined that Vitrano's mental impairments were not severe.

The ALJ's findings are supported by Vitrano's treatment records and by the decisions of the state agency psychologists. The record reflects that Vitrano consistently complained of depression and anxiety which were treated with medication. She did not see a mental health provider and she had no episodes of decompensation. Despite her complaints of depression and anxiety, the majority of Vitrano's treatment notes from her family practice provider include

7

unremarkable mental status examinations that show Vitrano to be alert, oriented, cooperative, well-groomed with appropriate judgment and insight. R. 637, 642, 646, 651, 655, 698, 700, 705, 738, 746, 778, 795, 801, 812, 816, 854.

Additionally, the only physicians who gave an opinion as to the functional limitations arising from Vitrano's mental impairments concluded that her depression and anxiety were not severe impairments, and she had only mild restrictions with daily activities and no restrictions with social functioning, concentration, persistence or pace and no episodes of decompensation. R. 161, 172–73. Further, Vitrano testified that she is able to care for her own personal needs, care for two cats, prepare meals, perform housekeeping tasks, drive a car, shop in stores, manage finances, read, complete Sudoku puzzles and socialize. R. 298–302. She also testified that she babysits her granddaughter for an hour and a half every day. R. 127.

Contrary to Vitrano's assertion, the ALJ did not err by failing to discuss the "paragraph A" criteria of listing 12.04 or 12.06. Only if an impairment is "severe" should the Commissioner move to the next step of the analysis and determine whether the severe impairment(s) or a combination thereof meet or medically equal a listed impairment. See Diaz v. Colvin, No. 8:13-705-RMG, 2014 WL 3887856, at *11 (D.S.C. Aug. 5, 2014) (citing Washington v. Astrue, 698 F. Supp. 2d 562, 581 (D.S.C. Mar.17, 2010) (finding that an ALJ need not evaluate whether an impairment found to be non-severe satisfies a particular listing)). Here, substantial evidence supports the ALJ's conclusion that Vitrano's mental impairments are non-severe and there was no reason for him to assess whether they met or equaled a listing.

I remain mindful of the substantial evidence standard in my review. Under this standard, the issue is not whether the ALJ could have found Vitrano's carpal tunnel syndrome, occipital nerve pain and migraines or mental impairments to be severe. Rather, the issue is whether

substantial evidence—more than a scintilla—in the record supports the ALJ's conclusion. Here, the ALJ's step two analysis is supported by substantial evidence and should not be disturbed. Further, as noted above, even if I find that the ALJ erred in his evaluation of Vitrano's impairments at step two, such error would be harmless because the ALJ continued the with sequential evaluation process and considered all of Vitrano's impairments, both severe and non-severe, that significantly impacted her ability to work. R. 84–96. For these reasons, I find no error on the part of the ALJ in determining Vitrano's impairments non-severe.

### **Physician Assistant Opinion**

Vitrano also argues that the ALJ erred by rejecting the opinion of Patricia Gilhuly, PAC, that she was incapable of employment. The record includes multiple opinions as to Vitrano's functional limitations arising from her impairments. On April 6, 2011, state agency physician Joseph Duckwall, M.D., reviewed Vitrano's records and determined that she was capable of lifting and carrying 20 pounds occasionally and 10 pounds frequently; standing and walking for 4 hours and sitting for 6 hours in an 8 hour day; limited pushing and pulling with her right upper extremity; occasionally climbing ramps, stairs, balancing, stooping, kneeling and crouching; and never crawling or climbing ladders, scaffolds or ropes. R. 162–63. On September 8, 2011, state agency physician John Sadler, M.D., reviewed Vitrano's records and agreed with Dr. Duckwall's assessment, with the additional limitation of frequent handling and fingering in both hands due to carpal tunnel syndrome. R. 174–75.

With regard to Vitrano's mental impairments, on April 7, 2011, state agency physician Howard S. Leizer, Ph.D., reviewed Vitrano's records and concluded that she had an affective disorder that was a non-severe impairment, and that she had a mild restriction of activities of daily living, no difficulties in maintaining social functioning, no difficulties with maintaining

9

concentration, persistence or pace, and no repeated episodes of decompensation. R. 161. On August 12, 2011, state agency psychologist Eric Wiener, Ph.D., reviewed Vitrano's records and agreed with Dr. Leizer's conclusions. R. 172–73.

Vitrano's treating physician assistant, Ms. Gilhuly, completed a Fibromyalgia Residual Functional Capacity Questionnaire on June 12, 2012, and noted that Vitrano had been her patient since July 2008, and was generally seen nine to ten times a year. R. 789. Ms. Gilhuly explained that Vitrano had fibromyalgia and her prognosis was fair. Ms. Gilhuly noted that there are no diagnostic tests for fibromyalgia, and because it is a "disease of exclusion," Vitrano has numerous normal labs. Id. Ms. Gilhuly listed Vitrano's multiple symptoms, including tender points, non-restorative sleep, chronic fatigue, morning stiffness, muscle weakness, frequent severe headaches, numbness and tingling, depression, and carpal tunnel syndrome. Ms. Gilhuly noted that Vitrano's depression contributes to the severity of her symptoms, and that she has aching, burning pain that varies in severity and location. R. 790. Ms. Gilhuly found that Vitrano's pain or other symptoms are severe enough to interfere with her concentration constantly, and that she is incapable of even "low stress" jobs. Id.

With regard to functional limitations, Ms. Gilhuly found that Vitrano can walk one city block without rest; can sit for 15 minutes at a time and stand for 10 minutes at a time; can sit, stand and walk less than 2 hours in an 8 hour work day; must walk for at least 5 minutes every 10–15 minutes; must shift positions at will from sitting to standing; and requires unscheduled breaks daily for at least 20 minutes each. R. 791. Ms. Gilhuly also found that Vitrano can occasionally lift less than 10 pounds and rarely less than 20; occasionally twist; rarely stoop; never crouch; never climb ladders or stairs; occasionally turn her head right or left, rarely look up or down and never hold her head in a static position. R. 792. Ms. Gilhuly also determined that

10

Vitrano has significant limitations with reaching, handling and fingering and is likely to be absent from work more than four days per month. Id.

The ALJ reviewed all of the opinions in the record and adopted the opinions of the state agency physicians that Vitrano was capable of performing a range of light work. R. 96. The ALJ rejected Ms. Gilhuly's opinion that Vitrano is incapable of working even at a sedentary level, finding it unsupported by the record as a whole, including Vitrano's mild physical findings and conservative treatment. R. 95.

Substantial evidence supports the ALJ's decision to give Ms. Gilhuly's opinion no weight and find Vitrano capable of performing a range of light work. As a physician assistant, Ms. Gilhuly is not an acceptable medical source as defined by the Act.[4] 20 C.F.R. §§ 404.1513, 416.913 (defining acceptable medical sources as licensed physicians, licensed or certified psychologists, and—for limited purposes—licensed optometrists, licensed podiatrists, and qualified speech-language pathologists). The opinions of non-acceptable medical sources are not entitled to any particular weight, and the ALJ is not required to explain the weight given to such opinions unless it might affect the case's outcome. See Adkins v. Colvin, No. 4:13-CV-00024, 2014 WL 3734331, at *3 (W.D. Va. July 28, 2014); see also Craig v. Chater, 76 F.3d 585, 590 (4th Cir. 1996) (finding no error in ALJ's failure to expressly weigh physical therapist's opinion).

---

[4] Vitrano argues that Ms. Gilhuly worked closely under the supervision of an accepted medical source, thus her opinion should be considered as if it is from an accepted medical source. Pl. Br. Summ. J. p. 21. Specifically, Vitrano argues that Ms. Gilhuly should be considered part of a team with Janice Luth, M.D., because they worked closely together. This argument is not convincing. Vitrano relies upon two cases finding that when a non-acceptable medical source is part of an "interdisciplinary team" with an acceptable medical source, their opinion should be treated as that of an acceptable medical source. See Jerry v. Comm'r, 97 F. Supp. 2d 1219, 1223 (D. Or. 2000); Gomez v. Chater, 74 F.3d 967, 971 (9th Cir. 1996). However, in Jerry, the opinion at issue was co-signed by both a licensed physician and a nurse practitioner. 97 F. Supp. 2d at 1223. Further, the social security statutes have been amended since the Gomez decision, and the Commissioner no longer includes "interdisciplinary team," under the definition of "acceptable medical sources." See 20 C.F.R. §§ 404.1513(a)(1–5), 416.913(a)(1–5), Hudson v. Astrue, No. CV-11-0025-CI, 2012 WL 5328786, at *4 n. 4 (E.D. Wa., Oct. 29, 2012). Here, although Dr. Luth signed a few of Ms. Gilhuly's treatment notes, she did not co-sign the June 12, 2012 opinion. Thus, there is no basis for the court to conclude that the opinion is attributable to both Ms. Gilhuly and Dr. Luth and is therefore from an acceptable medical source.

Nevertheless, the ALJ "has a duty to consider all of the evidence available in a claimant's case record, includ[ing] such evidence provided from 'other' nonmedical sources…" Ingle v. Astrue, 1:10CV141, 2011 WL 5328036, at *3 (W.D.N.C. Nov. 7, 2011) (citing Social Security Ruling ("SSR") 06–03p, 2006 WL 2329939 (SSA)(Aug. 9, 2006); 20 CFR §§ 404.1513(d), 416.913(d)). While evidence from these non-acceptable medical sources cannot be used to establish the existence of a medically determinable impairment; "such sources may provide evidence, including opinion testimony, regarding the severity of the claimant's impairments and [how] such impairment[s] affect the individual's ability to function." Id. (citing SSR 06–03p; 20 CFR §§ 404.1513(d), 416.913(d)); see also Ledbetter v. Astrue, 8:10–CV–00195–JDA, 2011 WL 1335840, at *10 (D.S.C. April 7, 2011) ("[O]pinions from medical sources, even when not 'acceptable medical sources,' are important and should be evaluated on key issues such as impairment severity and functional effects." (citing SSR 06–03p)).

To determine the weight given to the opinion of a source who is not an "acceptable medical source" as defined by the Act, the ALJ should consider: (1) the length of time the source has known the claimant and the frequency of their contact; (2) the consistency of the source's opinion with the other evidence; (3) the degree to which the source provides supportive evidence; (4) how well the source explains his or her opinion; (5) whether the source has an area of specialty or expertise related to the claimant's impairments; and (6) any other factors tending to support or refute the opinion. Beck v. Astrue, 3:11–CV–00711, 2012 WL 3926018, at *12 (S.D.W. Va. Sept. 7, 2012) (citing SSR 06–03p).

Here, the ALJ considered Ms. Gilhuly's professional qualifications, the length and nature of her examining relationship with Vitrano, the weight of the evidence supporting her opinion, and her opinion's consistency with the other relevant evidence in the record. The ALJ did not

simply dismiss her opinion because she was an "unacceptable medical source," but weighed it along with the other evidence in the record.[5] Thus, the ALJ did not use the wrong legal standard when weighing Ms. Gilhuly's opinion. See Smallwood v. Colvin, No. 4:13-CV-00069, 2015 WL 72115, at *9 (W.D. Va. Jan. 6, 2015).

Further, Ms. Gilhuly's opinion is contradicted by Vitrano's working history, Vitrano's testimony about her daily activities, and the other medical opinions in the record. Ms. Gilhuly's opinion indicates that Vitrano was incapable of even sedentary work beginning in 2007. R. 792. However, the record reflects that Vitrano worked at the substantial gainful activity level until 2011. R. 80. Ms. Gilhuly's treatment notes also reflect that Vitrano was working full time for the Home Shopping Network in December 2012 (R. 810) and June 2013 (R. 852), which contradicts her findings that Vitrano was incapable of any work at that time.

Additionally, Vitrano's reported daily activities are inconsistent with the severe restrictions imposed by Ms. Gilhuly. Vitrano reported that she lives alone, babysits her granddaughter for an hour and a half every day, cares for her own personal needs, cares for two cats, prepares meals, performs housekeeping tasks, drives a car, shops in stores, manages finances, reads, completes Sudoku puzzles and socializes. R. 127, 298–302. These activities are inconsistent with Ms. Gilhuly's findings that Vitrano's concentration is constantly interrupted due to pain, she can only occasionally lift more than 10 pounds; can rarely stoop and never crouch, squat, climb ladders or climb stairs; can only occasionally turn her head right or left, rarely look up or down and never hold her head in a static position. R. 792.

---

[5] Vitrano argues that ALJ discounted Gilhuly's opinion solely because she is not an acceptable medical source. Pl. Br. Summ. J. p. 20. This contention is plainly contradicted by the ALJ's opinion, which includes multiple bases upon which to discount Gilhuly's conclusions. The ALJ found that Gilhuly's findings are contradicted by the record as a whole, including her own treatment notes and Vitrano's work history. R. 95.

13

The ALJ also noted that Ms. Gilhuly's opinion is inconsistent with Vitrano's conservative course of treatment. R. 93. Despite the alleged severity of her symptoms, Vitrano was not referred to a rheumatologist for her fibromyalgia, and she has not undergone any surgery, physical therapy, or regular orthopedic, neurology, or mental health treatment. Ms. Gilhuly's opinion also conflicts with the opinions of the state agency physicians, the only acceptable medical opinions in the record, all of whom reviewed Vitrano's treatment records and concluded that she is capable of performing a range of light work. R. 161–63, 172–75.

Vitrano does not point to any evidence in the record that the ALJ failed to consider, or any standard of law that the ALJ failed to follow. Rather, Vitrano's arguments in support of Ms. Gilhuly's opinion amount to a disagreement with the ALJ's interpretation of the medical evidence. Vitrano argues that Ms. Gilhuly's report is "not contradicted by substantial evidence in the record." Pl. Br. Summ. J. p. 22. That is not the appropriate standard of review for this appeal. The question before me is whether the ALJ's decision is supported by substantial evidence, not whether there are other alternative conclusions that the ALJ could have or should have reached. Vitrano's disagreement with the ALJ's RFC is nothing more than an invitation for the court to re-analyze the facts, re-weigh the evidence and make a de novo determination of the proper RFC in this matter, which I am not permitted to do under the regulations. The issue before this court is not whether it is plausible that a different fact finder could have drawn a different conclusion or even if the weight of the evidence supports a finding of disability. The standard is whether the ALJ's decision is supported by substantial evidence. Here, substantial evidence supports the ALJ's decision to give Ms. Gilhuly's opinion little weight and instead determine that Vitrano is capable of performing a range of light work.[6]

---

[6] Vitrano also argues that the ALJ had a duty to recontact Ms. Gilhuly to resolve any alleged discrepancies between her report and the record. This too, is incorrect. The regulations state that a Commissioner "may"

14

**Function-by-Function Analysis**

Vitrano argues that the ALJ erred by failing to perform a function-by-function analysis of her impairments. Vitrano asserts that the ALJ failed to specify which of her spinal impairments, cervical or lumbar, he found to be severe, and which "impairments stemming from the fibromyalgia, he found the plaintiff to have nor how they impacted upon the residual functional capacity he assigned to the plaintiff." Pl. Br. Summ. J. p. 17. Vitrano also argues that the RFC developed by the ALJ does not account for her severe cognitive deficits with memory and concentration as well as pain and fatigue arising from her fibromyalgia. These arguments are simply disagreements with the ALJ's RFC determination and essentially ask the court to re-weigh the evidence.

SSR 96-8p requires the ALJ to include a narrative discussion describing how the evidence supports his conclusions when developing the RFC. 1996 WL 374184 (SSA) (July 2, 1996). Specifically, the ALJ is instructed to cite specific medical facts and non-medical evidence supporting his conclusion, discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis, describe the maximum amount of each work-related activity the individual can perform, and explain how any material inconsistencies or ambiguities in the evidence were considered and resolved. SSR 96-8p, 1996

---

recontact a treating physician, psychologist, or other medical source if after weighing the evidence the Commissioner cannot reach a conclusion about whether the claimant is disabled. 20 C.F.R. §§ 404.1520b(c), 416.920b(c). However, the regulation further states, "[i]f all of the evidence we receive, including all medical opinion(s), is consistent and there is sufficient evidence for us to determine whether you are disabled, we will make our determination or decision based on that evidence." 20 C.F.R. §§ 404.1520b(a), 416.920b(a). Additionally, SSR 96-5p states that "if the evidence does not support a treating source's opinion on any issue reserved to the Commissioner and the adjudicator cannot ascertain the basis of the opinion from the case record, the adjudicator must make 'every reasonable effort' to recontact the source for clarification of the reasons for the opinion." Notably, the regulation only refers to recontacting treating sources, and does not appear to apply to a non-acceptable medical source like Ms. Gilhuly. SSR 96–5p, 1996 WL 374183 (SSA) (July 2, 1996). Here, Ms. Gilhuly's opinion did not trigger a duty by the ALJ to recontact because the record was adequate to determine if Vitrano was disabled, and the opinion did not contain a conflict or ambiguity that must be resolved. See, e.g., Majica v. Astrue, No. 06-2900, 2007 WL 4443247, at * 3 (E.D. Pa. Dec. 18, 2007).

WL 374184, at *7. In the recent Fourth Circuit opinion, Mascio v. Colvin, the court rejected a "per se rule requiring remand when the ALJ does not perform an explicit function-by-function analysis," agreeing instead with the Second Circuit that "'[r]emand may be appropriate ... where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review.'" Mascio v. Colvin, 780 F.3d 632, 636 (4th Cir. 2015) (citing Cichocki v. Astrue, 729 F.3d 172, 177 (2d Cir. 2013)). "The Mascio Court held remand was necessary, in part, because the ALJ failed to indicate the weight given to two residual functional capacity assessments which contained relevant conflicting evidence regarding the claimant's weight lifting abilities." Newcomb v. Colvin, No. 2:14–CV–76, 2015 WL 1954541, at *3 (N.D.W. Va. Apr. 29, 2015).

Here, the ALJ's decision includes the narrative discussion required by SSR 96-8p, and contains sufficient information to allow meaningful review. Unlike the ALJ in Mascio, the ALJ in this case did not fail to consider conflicting medical evidence. Further, the court is "not left to guess about how the ALJ arrived at his conclusions" because the ALJ's findings include a detailed summary of Vitrano's medical records, the medical opinions, Vitrano's hearing testimony and the ALJ's conclusions. R. 78–97. The ALJ spent twelve pages discussing the evidence in the record that supports his findings on Vitrano's limitations. R. 84–96. The RFC delineates Vitrano's exertional limitations, and includes specific amounts of weight that Vitrano can lift and/or carry, and amounts of time that Vitrano can perform activities such as standing, walking, sitting, pushing and pulling. R. 84. The ALJ considered the conflicting medical opinions in the record and provided an explanation as to why he gave great weight to some opinions and no weight to others. R. 94–96.

Vitrano's assertions that the ALJ erred by generalizing her cervical, thoracic and lumbar spinal conditions as one "spinal impairment," and by failing to consider that she suffers from cognitive deficits arising from fibromyalgia and migraines are unsupported. See Pl. Br. Summ. J. p. 17. As noted above, the ALJ reviewed Vitrano's medical records in detail, including the records referenced by Vitrano in support of these arguments. The ALJ also properly considered whether Vitrano could perform work functions for a full work day. Vitrano correctly notes that that SSR 96–8p requires that "[i]n assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record." SSR 96–8p, 1996 WL 374184, at *7. Here, the ALJ appropriately expressed Vitrano's ability to sit, stand, or walk in terms of an eight-hour workday. R. 84. As for other functions, the ALJ limited Vitrano to occasional pushing/pulling with the right upper extremity, and occasional postural activities such as climbing stairs or ramps, balancing, stooping, kneeling, crouching, or crawling. Id. The ability to perform a function on an "occasional" basis corresponds to one-third of an eight-hour workday. See SSR 83–10, 1983 WL 31251, at *5–6 (1983). Thus, the ALJ appropriately discussed Vitrano's abilities as they could be performed over the course of the workday. See Dugger v. Colvin, No. 5:15-CV-00020-MOC, 2015 WL 6455390, at *7–8 (W.D.N.C. Oct. 26, 2015); Ashby v. Colvin, No. 2:14-674, 2015 WL 1481625, at *5 (S.D.W. Va. Mar. 31, 2015).

**Credibility**

Vitrano also argues that the ALJ improperly discredited her testimony by relying upon misstatements of the record or irrelevant evidence. Vitrano argues that the ALJ's credibility

17

analysis fails under Mascio v. Colvin, because Vitrano's alleged "inconsistencies" are misstatements of the record or are irrelevant to Vitrano's credibility as a whole. In Mascio, the court determined that the ALJ did not explain how he decided which of Mascio's statements to believe and which to discredit, other than the vague boilerplate statement that he did not believe any claims of limitations beyond what he found when considering Mascio's RFC.[7] 780 F.3d at 640. It was this "lack of explanation," that the court held warranted remand. Id.; see also, Hutton v. Colvin, No. 2:14-cv-63, 2015 WL 3757204, at *6 (N.D.W. Va. June 16, 2015). Here, the ALJ provided explanation for his credibility analysis, which is supported by the record.

When evaluating Vitrano's credibility, the ALJ noted that the treatment record does not support her allegations regarding the severity of her limitations, and specifically, that repeated physical examinations failed to reveal ongoing psychological signs, significant neurological deficits, or decreased strength and range of motion as would be expected with the degree of limitation alleged. R. 93. The ALJ also discounted Vitrano's credibility due to her inconsistent statements related to her work history, which evidenced earnings above the substantial gainful activity level during the time period in which Vitrano asserts she was disabled. Id. Additionally, Vitrano reported that she worked as a customer service representative for the Home Shopping Network until September 2011; however, her treatment records reflect that she was employed in that position in December 2012 and June 2013. R. 810, 852. The ALJ also noted that Vitrano's statements with regard to her weight were contradicted by her treatment records. R. 94.

It is apparent from his decision that the ALJ reviewed with detail the medical record regarding Vitrano's impairments and measured her credibility against the objective medical evidence. Credibility determinations are the province of the ALJ, not the court, and courts

---

[7] The ALJ's decision in this case does not contain the boilerplate credibility language that the Mascio court determined "gets things backwards," by implying that the ability to work is determined first and then is used to determine the claimant's credibility. See Mascio, 780 F.3d at 639.

18

normally should not interfere with these determinations. See, e.g., Chafin v. Shalala, No. 92-1847, 1993 WL 329980, at *2 (4th Cir. Aug. 31, 1993) (per curiam) (citing Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990) and Thomas v. Celebrezze, 331 F.2d 541, 543 (4th Cir. 1964)); Melvin v. Astrue, 6:06 CV 00032, 2007 WL 1960600, at *1 (W.D. Va. July 5, 2007) (citing Hatcher v. Sec'y of Health & Human Servs., 898 F.2d 21, 23 (4th Cir. 1989)). The ALJ's credibility determination is supported by substantial evidence, as set forth more fully above, and the court will not disturb it. See Johnson, 434 F.3d at 658-59 (citing Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996)).[8]

---

[8] Vitrano also argues that the ALJ failed to appropriately weigh the testimony of her friend, Bonnie Kenyon, who testified at the administrative hearing.Pl. Br. Summ. J. p. 28. The ALJ recounted Ms. Kenyon's testimony in his decision and considered her statement that Vitrano could sit for about 15 minutes before needing to stand up and drive for 30 minutes due to pain. R. 86. Contrary to Vitrano's assertion, the regulations do not require the ALJ to assign a specific weight to Ms. Kenyon's testimony. See 20 C.F.R. § 404.1513(d)(4) ("In addition to evidence from acceptable medical sources listed in paragraph (a) of this section, we may also use evidence from other sources… for example, spouses, parents and other caregivers…"). Additionally, the United States Court of Appeals for the Fourth Circuit has held that it is unnecessary to discuss the testimony of lay witnesses where it is inconsistent with other evidence in the record. See Laws v. Celebrezze, 368 F.2d 640, 644 (4th Cir. 1966). Here, the ALJ properly considered the evidence in the record, including Ms. Kenyon's testimony, and provided a sufficient explanation for the RFC. The ALJ did not err by failing to expressly weigh Ms. Kenyon's testimony when explaining his disability determination.

## **CONCLUSION**

It is not the province of the court to make a disability determination. The court's role is limited to determining whether the Commissioner's decision is supported by substantial evidence, and in this case, substantial evidence supports the ALJ's opinion. The ALJ properly considered all of the objective and subjective evidence in adjudicating Vitrano's claim for benefits and in determining that her physical and mental impairments would not significantly limit her ability to do basic work activities. Accordingly, I **AFFIRM** the Commissioner's decision, Vitrano's motion for summary judgment is **DENIED**, and the Commissioner's motion for summary judgment is **GRANTED**.

Enter: March 14, 2016

*Robert S. Ballou*

Robert S. Ballou
United States Magistrate Judge